UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SUZIE BABA WILSON, *et al.*, | ) | |
| | ) | |
| Appellants, | ) | Case No. 25-cv-15741 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| ARIANE HOLTSCHLAG, *et al.*, | ) | |
| | ) | |
| Appellees. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

A family of real estate companies owning hundreds of residential properties in Chicagoland filed for bankruptcy. The bankruptcy didn't go as planned. The bankruptcy estate had trouble selling the properties, and it was running out of cash.

Under stress, the estate needed help pursuing valuable avoidance actions before the one-year time limit to bring them expired. So it tapped its biggest creditor, the City of Chicago, to take over. The City had the resources to litigate the actions and the incentives to maximize the recovery.

The bankruptcy court granted the City derivative standing to pursue the avoidance actions on behalf of the estate. Suzie Baba Wilson and Swedlana Dass, who are equity holders and potential targets of the avoidance actions, appealed that grant of authority.

The City moved to dismiss the appeal for lack of appellate standing. For the following reasons, the City's motion is granted.

### Background

This appeal arises from the bankruptcy of 21 related real estate companies. *See In re B.A.S.S. & M., Inc.*, 24-bk-15381 ("*In re B.A.S.S.*"). The debtors owned 812 rental residential properties throughout Chicagoland at the time of their voluntary Chapter 11 petition in October 2024. *See In re B.A.S.S.*, Schedules 1 and 2 (Dckt. No. 1, at 5–25 of 34).

In bankruptcy, the debtors attempted to raise cash by auctioning the properties. *See In re B.A.S.S.*, Mtn. to Convert to Ch. 7, at ¶¶ 7–12 (Dckt. No. 676, at 10–11 of 13). They managed to sell 275 parcels, but fell short of the amount needed to pay their administrative expenses. *Id.* at ¶¶ 11–12.

Lacking liquidity, the debtors couldn't proceed under Chapter 11. So, the bankruptcy court converted the case to Chapter 7 in October 2025. *Id.* at ¶ 13; *see In re B.A.S.S.*, 10/8/25 Order (Dckt. No. 709). A Chapter 7 trustee was appointed to administer and liquidate what remained of the debtors' estate. *See In re B.A.S.S.*, 10/14/25 Entry (Dckt. No. 712).

The Chapter 7 trustee usually prosecutes avoidance actions on the estate's behalf. Avoidance actions recover assets that were improperly transferred from the debtors on the eve of bankruptcy. *See, e.g.*, 11 U.S.C. §§ 541–45, 547–50. Common avoidable transfers include preference payments and fraudulent transfers. *See* 11 U.S.C. §§ 547–48.

But the trustee in this case, Ariane Holtschlag, had difficulty pursuing those actions. She was new to the case, joining over a year after the bankruptcy began. *See* 12/16/25 Tr., at 18:21–19:20 (Dckt. No. 6). And this estate was especially unwieldy and complex, and contained well over 500 properties. *Id.*

Even worse, the estate was running low on funds to retain counsel and prosecute the avoidance actions, as the trustee explained to the bankruptcy court. *Id.* at 4:4-8 ("I have been struggling to get up to speed on all this; and if I had to hire a new attorney, even if I could get one on a contingent fee, they would have to get up to speed with all this."); *id.* at 11:5-13 ("I think it would be very difficult, if not impossible, for me to obtain separate counsel in sort of the traditional sense. That's sort of in my experience and looking forward, I believe I would be unable to pursue these claims but for a situation like this. So we can kind of go through that exercise, but we are all sort of seeing the writing on the wall."); *see also id.* at 19:16-20 ("It's also a situation with limited resources that are liquid in the estate. There may be all sorts of nonliquid assets, but those take – that takes liquidity, that takes cash to reduce to liquid assets that can be distributed to creditors.") (quoting the bankruptcy court).

Time was ticking, too. The Bankruptcy Code requires avoidance actions to be commenced no later than one year after the appointment of a Chapter 7 trustee. *See* 11 U.S.C. § 546(a); *see also* 12/16/25 Tr., at 15:11-19 (Dckt. No. 6); 1/13/26 Tr., at 10:21–11:1 (Dckt. No. 6-1). Any delay could leave money on the table and out of reach.

So the trustee, the City of Chicago, and the debtor-in-possession lender (Nine Left) devised a solution. They moved for the bankruptcy court to grant the City derivative standing to bring the avoidance actions on behalf of the estate. *See In re B.A.S.S.*, Mtn. for Derivative Standing (Dckt. No. 724, at 6 of 19). Derivative standing would allow the City to investigate and prosecute the estate's avoidance actions, bringing assets back within the estate's reach.

The City was well-positioned to take charge. It was the estate's largest creditor, so it had every incentive to help the estate recover as much money as possible. *See* 12/16/25 Tr., at 12:3-5 (Dckt. No. 6) ("[T]he City is the biggest secured creditor, the biggest creditor against the estate no matter what.") (quoting the bankruptcy court). The City also was "intimately" familiar with the properties and the case. *Id.* at 18:23 (quoting the bankruptcy court).

But under the plan, the City's power would be limited. The plan preserved ultimate discretion with the Chapter 7 trustee, which would supervise the City's actions and make any

2

final litigation decisions. *See* 12/16/25 Order, at ¶ 5 (Dckt. No. 1-3) ("The City shall obtain the consent of the Trustee and of Nine Left prior to bringing any action or agreeing to settle any action under this Order."); 1/13/26 Tr., at 6:1-7 (Dckt. No. 6-1) ("But it is the court's understanding from prior hearings and testimony from the trustee that the trustee will, in fact, actively participate in decision-making with respect to any derivative lawsuits filed by the City, including who should be sued, which cases should be tried and which cases should be settled.") (quoting the bankruptcy court).

Suzie Baba Wilson and Swedlana Dass objected to the motion to grant derivative standing. *See In re B.A.S.S.*, Notice of Objection (Dckt. No. 728).

Wilson and Dass are key players in the bankruptcy. They own equity in some of the debtors. *See* 1/13/26 Tr., at 4:17–5:3 (Dckt. No. 6-1). Wilson and Dass managed the debtors before the bankruptcy and served as directors of the parent debtor, B.A.S.S. & M., Inc. *See In re B.A.S.S.*, 10/15/24 Resolution of the Board of Directors (Dckt. No. 1, at 29 of 34). They took an active role in the bankruptcy case until it was converted to Chapter 7. *See In re B.A.S.S.*, 11/25/25 Mtn. to Designate (Dckt. No. 722, at 5 of 12).

They also were the potential targets of avoidance actions. Wilson and Dass allegedly directed the debtors to "transfer funds in violation of state law freezing their assets when the citations [to discover assets] were served" before the bankruptcy. *See In re B.A.S.S.*, Mtn. for Derivative Standing (Dckt. No. 724, at 7–10 of 19) (describing the alleged fraudulent transfers and other wrongdoing).

That possibility might have motivated Wilson and Dass's opposition to the motion to grant derivative standing to the City. *See* 12/16/25 Tr., at 15:13-19 (Dckt. No. 6) ("So I see that a target or potential defendant for these actions absolutely wants to drag this out, absolutely wants to brief this, absolutely wants this to go into summer so we don't have the ability to bring these kind of actions or to investigate them fully before we bring them.") (quoting counsel for the City of Chicago).

On the merits, Wilson and Dass argued that "the Seventh Circuit's stringent standards for derivative standing" weren't met in this case. *See* 12/16/25 Tr., at 6:16-18 (Dckt. No. 6). They also contended that "the City's significant creditor status and prebankruptcy litigation against [Wilson and Dass] . . . creates [sic] an inherent conflict of interest," which precludes the City from obtaining derivative standing. *Id.* at 8:16-20.

The bankruptcy court granted the City derivative standing over Wilson and Dass's objection. *See* 12/16/25 Order, at ¶¶ 2–7 (Dckt. No. 1-3).

Only a few weeks later, in January, 2026, Wilson and Dass's fears came true. "On January 13, 2026, the City filed [two] adversary complaints . . . against Appellants personally, seeking to avoid and recover transfers totaling over $185,000 allegedly made in violation of state court citation injunctions." *See* Mtn. to Stay, at 2 (Dckt. No. 11).

The complaints allege that Wilson and Dass knowingly violated state-court citation injunctions by using the debtors' funds to pay attorneys. *See In re B.A.S.S.*, ArentFox Cplt., at ¶ 1 (Dckt. No. 767); *In re B.A.S.S.*, DeVore Radunsky Cplt., at ¶ 1 (Dckt. No. 768). A third complaint with similar allegations soon followed. *See In re B.A.S.S.*, Landsman Cplt., at ¶ 1 (Dckt. No. 769).

The City then moved for leave to initiate Rule 2004 examinations. *See In re B.A.S.S.*, Rule 2004 Mtn. (Dckt. No. 773, at 3 of 21). Rule 2004 allows a party in interest to gather financial information and records to aid the estate's pursuit of avoidance actions. *See* Fed. R. Bankr. P. 2004.

According to Wilson and Dass, the City wanted to conduct "extensive discovery" into "Appellants personally, their accountants, their attorney, and various affiliated entities" to acquire details about their "personal financial affairs and business dealings [and] sensitive financial information." *See* Mtn. to Stay, at 2 (Dckt. No. 11).

The bankruptcy court granted the City's Rule 2004 motion over Wilson and Dass's objection. *See In re B.A.S.S.*, 2/3/26 Order (Dckt. No. 779); *In re B.A.S.S.*, Resp. to Rule 2004 Mtn. (778).

That brings the Court to this appeal. Wilson and Dass timely appealed the derivative-standing order to this Court. *See generally* Notice of Appeal (Dckt. No. 1). On the merits, Wilson and Dass reiterate their position from below. *See generally* Appellants' Br. (Dckt. No. 14).

But the City raised a preliminary challenge to the appeal that comes before the merits. The City of Chicago moved to dismiss the appeal for lack of standing. *See* Mtn. to Dismiss (Dckt. No. 7).

### Legal Standard

District courts have jurisdiction to hear bankruptcy appeals as specified by 28 U.S.C. § 158. "The district court functions as an appellate court when reviewing bankruptcy court decisions." *In re Pre-Press Graphics Co., Inc.*, 307 B.R. 65, 70 (N.D. Ill. 2004) (citing *Bielecki v. Nettleton*, 183 B.R. 143, 145 (N.D. Ill. 1995)); *see also* Fed. R. Bankr. P. 8013.

"A federal district court reviews a bankruptcy court's factual findings for clear error, and reviews the bankruptcy court's legal conclusions de novo." *In re Marsh*, 929 F. Supp. 2d 852, 854 (N.D. Ill. 2013) (citing *Bielecki*, 183 B.R. at 145); *see also In re Mississippi Valley Livestock, Inc.*, 745 F.3d 299, 302 (7th Cir. 2014) ("Like the district court, we review a bankruptcy court's factual findings for clear error and its legal conclusions *de novo.*"); *Petr Tr. for BWGS, LLC v. BMO Harris Bank N.A.*, 95 F.4th 1090, 1097 (7th Cir. 2024) ("We review the judgment of the district court using the same standard of review with which the district court reviewed the bankruptcy court's ruling. Like the district court, we review a bankruptcy court's factual findings for clear error and its legal conclusions de novo.") (internal quotation marks omitted); *In re Wilson*, 663 B.R. 806, 808 (N.D. Ill. 2024) ("When adjudicating bankruptcy

appeals, this Court applies a dual standard of review:  the bankruptcy court's findings of fact are reviewed for clear error, while its conclusions of law are reviewed *de novo*."); *see also* 1 Collier on Bankruptcy ¶ 5.12 (16th ed. 2026).

Standing is a legal determination that hinges on subsidiary factual findings.  So, the Court applies a mixed standard of review.  As an appellate court, the Court "review[s] the legal question of standing *de novo* and the factual findings underlying the [bankruptcy] court's determination of standing for clear error."  *See Cook Cnty., Ill. v. Wolf*, 962 F.3d 208, 218 (7th Cir. 2020); *Common Cause Indiana v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019) ("We evaluate legal questions *de novo* and review any factual determinations necessary to resolve . . . standing for clear error.").

## Analysis

## I.    Appellate Jurisdiction and Procedure

To hear this appeal, the Court must have subject matter jurisdiction.  A district court's subject matter jurisdiction over bankruptcy appeals is governed by 28 U.S.C. § 158.

Section 158 distinguishes between an interlocutory appeal and an appeal of final judgments.  *See* 28 U.S.C. § 158(a).  District courts have broad "subject matter jurisdiction to hear appeals . . . from *final* judgments, orders, and decrees . . . of bankruptcy judges."  *Id.* (emphasis added).  Interlocutory appeals, however, are permitted only "with leave of court."  *Id.* at § 158(a)(3).

If an order is final, it is appealable as of right.  If an order isn't final, then it is interlocutory, and the appellant must request leave.

In a typical civil case, final orders completely resolve a case on the merits and terminate the case.  *See Sik Gaek, Inc. v. Harris*, 789 F.3d 797, 799 (7th Cir. 2015) ("A final decision is one which ends the litigation on the merits and leaves nothing for the district court to do but execute the judgment.").

But "[f]inality in the context of bankruptcy jurisprudence is 'considerably more flexible than in an ordinary civil appeal taken under 28 U.S.C. § 1291.'"  *See In re Smith*, 582 F.3d 767, 776 (7th Cir. 2009) (quoting *Zedan v. Habash*, 529 F.3d 398, 402 (7th Cir. 2008)).  That's because "a bankruptcy case is an aggregation of individual controversies" that are often decided well before the bankruptcy ends as a whole.  *See* 1 Collier on Bankruptcy ¶ 5.08 (16th ed. 2026); *see also In re James Wilson Assocs.*, 965 F.2d 160, 166 (7th Cir. 1992) ("A bankruptcy proceeding, in contrast, is often a conglomeration of separate adversary proceedings that, but for [the bankruptcy], would be separate, stand-alone lawsuits.").

For practical reasons, potential stakeholders and other interested parties need to be able to pursue appeals before a broader bankruptcy case concludes.  *See Ritzen Grp., Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 38–39 (2020) ("Delaying appeals from discrete, controversy resolving decisions in bankruptcy cases would long postpone appellate review of fully

5

adjudicated disputes. Moreover, controversies adjudicated during the life of a bankruptcy case may be linked, one dependent on the outcome of another. Delaying appeal until the termination of the entire bankruptcy case, therefore, could have this untoward consequence: Reversal of a decision made early on could require the bankruptcy court to unravel later adjudications rendered in reliance on an earlier decision."); *In re James Wilson*, 965 F.2d at 166 ("Parties to those separate proceedings should not have to wait for the end of the entire bankruptcy proceeding before they can appeal.").

So, in bankruptcy cases, courts take a more relaxed approach to finality than usual. "An order of the bankruptcy court may be considered final, and thus immediately appealable, when it definitively resolves a discrete dispute within the larger case." *See In re Smith*, 582 F.3d at 776; *see also In re Comdisco, Inc.*, 538 F.3d 647, 651 (7th Cir. 2008) (Wood, J.) ("The final disposition of an adversary proceeding within a core proceeding thus falls within our jurisdiction."). Usually, final orders in a bankruptcy case "ultimately determine a creditor's position in the bankruptcy proceeding, even though administration of the debtor's estate continues." *See Matter of Forty-Eight Insulations, Inc.*, 115 F.3d 1294, 1299 (7th Cir. 1997).

This appeal is interlocutory, because the order granting the City derivative standing was not final. The derivative-standing order is merely a "procedural [order that] authorize[s] the commencement of litigation." *See Moran v. Off. Comm. of Admin. Claimants*, 2006 WL 3253128, at *2 (N.D. Ohio 2006), *aff'd sub nom. In re LTV Steel Co., Inc.*, 560 F.3d 449 (6th Cir. 2009). It allows the City to initiate avoidance actions, but it doesn't decide those actions or otherwise determine anyone's rights within the broader bankruptcy proceeding.

Other courts agree that a derivative-standing order is interlocutory. *See In re Trailer Source, Inc.*, 555 F.3d 231, 235 (6th Cir. 2009) (noting that an appeal of an order granting derivative standing to a creditor to pursue avoidance actions is "interlocutory"); *Moran*, 2006 WL 3253128, at *2 ("In the present case, no discrete dispute has been decided. The . . . Order only authorizes the [creditor] to pursue claims on behalf of [the estate]. . . . No substantive rights have been determined by the . . . Order. The Order was purely procedural and it only authorized the commencement of litigation."); *In re Sandenhill, Inc.*, 304 B.R. 692, 694 (E.D. Pa. 2004) (describing an "order . . . granting derivative standing to an unsecured creditor in a Chapter 7 action to pursue an avoidance action on behalf of the estate" as "interlocutory"); *In re Roman Cath. Church of Archdiocese of Santa Fe*, 2021 WL 408971, at *4 (Bankr. D.N.M. 2021) ("An order granting derivative standing is interlocutory.").

The bankruptcy court below agreed, too. *See* 1/13/26 Tr., at 7:11-12 (Dckt. No. 6-1) ("[N]othing in the court's derivative authority order reaches any final determination regarding liability for any party in any prospective avoidance action. All it does is establish a procedure for moving forward with those lawsuits. That order, in the court's opinion, is clearly interlocutory, not final.").

Ultimately, the avoidance actions themselves will likely yield final judgments that are appealable. The derivative-standing order will be appealable as a part of those final judgments. *See* Mtn. to Dismiss, at 11 (Dckt. No. 7) ("At the end of those cases the derivative standing order will become final and may be appealed as a matter of right.").

But the present appeal seeks review before the bankruptcy court's decision has matured into a final judgment. So this appeal is interlocutory.

Wilson and Dass require leave to appeal an interlocutory order. *See* 28 U.S.C. § 158(a)(3). Technically, an appellant should file a section 158(a)(3) motion for leave to appeal with the bankruptcy court before appealing. *See* Fed. R. Bankr. P. 8004(a)–(b). But, if the appellant didn't make the proper motion, the district court may "treat the notice of appeal as a motion for leave to appeal and grant or deny it." *See* Fed. R. Bankr. P. 8004(d).

Here, Appellants filed a timely appeal, but they did not move for leave from the bankruptcy court to pursue an appeal. *See* Fed. R. Bankr. P. 8002(a)(1); Mtn. to Enforce Finality, at 8 (Dckt. No. 10) ("Appellants did not file a separate motion for leave to appeal with the Notice of Appeal.").

So, the Court treats their notice of appeal as a motion for leave to appeal. *See* Fed. R. Bankr. P. 8004(d). In the end, the Court will not have to decide whether to accept the appeal, because Wilson and Dass lack standing.

## II.     Standing

### A.     Standing Requirements for Bankruptcy Appeals

Bankruptcy appellants, like all appellants, must have standing to appeal. *See In re Ray*, 597 F.3d 871, 874 (7th Cir. 2010); *Virginia House of Delegates v. Bethune-Hill*, 587 U.S. 658, 662 (2019) ("The standing requirement therefore 'must be met by persons seeking appellate review, just as it must be met by persons appearing in courts of first instance.'") (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997)).

The appellate-standing requirement goes unspoken and unanalyzed in a typical civil case. Most of the time, the existence of standing is obvious. The losing parties have standing to appeal a lower court's adverse ruling because it caused them direct harm that a reversal can redress. *See* 1 Collier on Bankruptcy ¶ 5.07 (16th ed. 2026) ("In a typical civil case, there is a plaintiff and a defendant, one of which loses at the trial level. It is therefore unnecessary to set strict standards regarding standing on appeal because the person appealing is the party to the action who lost below.").

But bankruptcy is a different animal. "[B]ankruptcy litigation frequently involves and affects the interest of entities that are frequently not formally parties to a particular adversary proceeding or contested matter." *Id.* Some, but not all, interested parties have a stake sufficient to create standing to appeal a bankruptcy order. *Id.* ("Procedural chaos would result from a rule that all parties who are involved directly, indirectly, or tangentially in the case have the power to appeal any order entered by a bankruptcy judge.").

In the Seventh Circuit, bankruptcy appellants must have both constitutional standing and bankruptcy standing.

7

The familiar Article III standing requirements apply to bankruptcy appeals. *See In re GT Automation Grp., Inc.*, 828 F.3d 602, 604 (7th Cir. 2016). "To establish Article III standing, 'a plaintiff must show (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *See Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

For Article III standing in the appellate context, a court asks whether the lower court's "judicial decision . . . inflicts a discrete, cognizable injury on" the appellant. *See Bethune-Hill*, 587 U.S. at 666. That injury must be redressable by the desired remedy – a reversal.

Bankruptcy appellants also must have bankruptcy standing, "a form of prudential standing which is more confined than Article III standing." *See In re Ray*, 597 F.3d at 875; *see also In re Cult Awareness Network, Inc.*, 151 F.3d 605, 607 (7th Cir. 1998) (calling bankruptcy standing "narrower than Article III standing").

Bankruptcy standing requires an appellant to be "a 'person aggrieved' by [the appealed] order." *See In re Holly Marine Towing, Inc.*, 669 F.3d 796, 800 (7th Cir. 2012); *see also In re Ray*, 597 F.3d at 874 (internal quotation marks omitted) ("Only a 'person aggrieved' has [bankruptcy] standing to appeal an order of the bankruptcy court.").[1]

The Seventh Circuit has phrased the person-aggrieved standard in two ways.

One focuses on the appellant's pecuniary interests. A "person aggrieved" "must demonstrate that he has a pecuniary interest in the outcome of the bankruptcy proceedings." *See In re Holly Marine*, 669 F.3d at 800 (internal quotation marks omitted). "Only those persons affected pecuniarily by a bankruptcy order have standing to appeal that order." *In re Ray*, 597 F.3d at 874 (cleaned up).

The other examines the order's effects on the appellant's property, burdens, or rights. "A 'person aggrieved' by a bankruptcy order must demonstrate that the order diminishes the person's property, increases the person's burdens, or impairs the person's rights." *Matter of DuPage Boiler Works, Inc.*, 965 F.2d 296, 297 (7th Cir. 1992); *see also In re Ray*, 597 F.3d at 874 (quoting *In re Cult Awareness*, 151 F.3d at 608 (citing *DuPage Boiler*, 965 F.2d at 297 and *In re Andreuccetti*, 975 F.2d 413, 416 (7th Cir. 1992))).

The Seventh Circuit has clarified that these two alternative phrasings describe the same substantive rule. "Read in context, . . . the [property-burdens-rights] rule . . . is not broader than the [pecuniary-interest] rule[.]" *In re Cult Awareness*, 151 F.3d at 608. Both rules amount to

---

[1] Bankruptcy standing also requires as a prerequisite that "a party . . . appear at a hearing [and] object to a motion or proceeding" before the bankruptcy court. *See In re Ray*, 597 F.3d at 874. Wilson and Dass appeared and objected below, so they have met this requirement.

"the same substantive rule," and "[t]he pecuniary interest rule is certainly the rule of this Circuit." *Id.*

The Seventh Circuit and other courts now use both standards together. *See, e.g.*, *In re Ray*, 597 F.3d at 874 (presenting the pecuniary-interest and property-burdens-rights standards as a single standard); *Young v. Lake Cnty. Treasurer*, 2024 WL 4864447, at *2 (7th Cir. 2024) ("Young lacks standing to appeal for the reason that the order did not pecuniarily affect him. An order pecuniarily affects him only if it diminishes his property, increases his burdens, or impairs his rights."); *see also In re Combustion Eng'g, Inc.*, 391 F.3d 190, 214 (3d Cir. 2004), as amended (Feb. 23, 2005) ("Standing to appeal in a bankruptcy case is limited to 'persons aggrieved' by an order of the bankruptcy court. Originally set forth in the Bankruptcy Act of 1898, the 'persons aggrieved' test now exists as a prudential standing requirement that limits bankruptcy appeals to persons whose rights or interests are directly and adversely affected pecuniarily by an order or decree of the bankruptcy court. 'Persons aggrieved' must show the order of the bankruptcy court diminishes their property, increases their burdens, or impairs their rights. Whether someone is a person aggrieved is normally a question of fact.").

So, under either rule, there must be a concrete, pecuniary lodestar underpinning appellate standing. The order must have caused a pecuniary harm to the appellant, meaning that the appellant had its property diminished, its burdens increased, or its rights impaired. Said yet another way, an appellant must be able "'to realize an[] economic benefit from a potential reversal.'" *See In re GT Automation*, 828 F.3d at 604 (quoting *In re Stinnett*, 465 F.3d 309, 315 (7th Cir. 2006)).

The pecuniary effects of a bankruptcy order on an appellant's interests must be direct, too. Appellants must be "'directly and adversely affected' by a bankruptcy order . . . to [be able to] challenge it." *See In re Holly Marine*, 669 F.3d at 800 (quoting *Matter of Fondiller*, 707 F.2d 441, 442 (9th Cir. 1983)); *see also In re Ray*, 597 F.3d at 874 (observing that bankruptcy standing "allow[s] only those persons whose interests are directly affected by a bankruptcy order to appeal").

In sum, the requirements of both Article III standing and bankruptcy standing apply to Wilson and Dass's bankruptcy appeal. Under Article III, Appellants must have suffered a cognizable injury that is fairly traceable to the bankruptcy court's order, and that is redressable by a reversal. Under bankruptcy standing, Appellants must be persons aggrieved, and must show that the order directly and adversely affects their pecuniary interests by diminishing their property, increasing their burdens, or impairing their rights.

## B.     *Lexmark* **and Prudential Standing**

Again, bankruptcy standing is a form of prudential standing. Everyone's spidey-senses should tingle when they hear that a standing doctrine is "prudential."

The Supreme Court has cast serious doubt on the continued vitality of prudential standing. *See Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *In re GT Automation*, 828 F.3d at 605 n.1. So, before addressing bankruptcy standing,

9

the Court must turn to a wrinkle – or perhaps a tidal wave – created by the Supreme Court's decision in *Lexmark*.

In a nutshell, "[t]here is some debate regarding whether the Seventh Circuit's characterization of 'bankruptcy standing' as a form of prudential standing survives [*Lexmark*]." *Helmstetter v. Herzog*, 2021 WL 2948912, at *10 (N.D. Ill. 2021), *aff'd sub nom. In re Helmstetter*, 44 F.4th 676 (7th Cir. 2022); *see also Lexmark*, 572 U.S. at 125–28.

*Lexmark* involved an appeal of a false-advertising claim under the Lanham Act. *See Lexmark*, 572 U.S. at 125. The parties in *Lexmark* argued that prudential standing restricted the plaintiffs' ability to sue. *Id.* at 124–26. These limits were "prudential" because they were not "derived from Article III" or from the text of the Lanham Act. *Id.* at 124–26. Rather, judges crafted the heightened standing requirements based on prudential considerations.

The Supreme Court in *Lexmark* disavowed any judge-made limits to standing in the Lanham Act context. Prudential standing conflicted with the Supreme Court's "recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Id.* at 126 (cleaned up).

Under *Lexmark*, two things control a federal court's jurisdiction: the Constitution (as interpreted by the Supreme Court), and Congress. That doesn't leave room for the prudential views of lower courts. Lower courts can't close a door to the courthouse left open by the Constitution and by Congress.

From a constitutional perspective, the Supreme Court has gleaned from Article III "a set of requirements that together make up the 'irreducible constitutional minimum of standing.'" *Id.* at 125 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *see also id.* (observing that these requirements come from Article III's cases-and-controversies clause "and the separation-of-powers principles underlying that limitation"). The Constitution itself creates limits on who can bring a claim.

Congress has a big role to play, too. Congress creates causes of action, and controls the jurisdiction of the lower courts. *See* U.S. Const. amend. III, § 1. So, Congress could also restrict parties' standing to sue by statute.

But as a general matter, Congress has not limited standing. The general jurisdictional statutes – such as the provisions for federal question jurisdiction (28 U.S.C. § 1331) and diversity jurisdiction (28 U.S.C. § 1332) – don't confine standing at all.

So, in the usual case, Article III is the be-all-and-end-all of standing. Under *Lexmark*, a court may not pile on standing requirements beyond those imposed by Article III, regardless of the practicalities or prudential necessities. Again: "A federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *See Lexmark*, 572 U.S. at 126 (cleaned up).

10

However, standing isn't the only thing limiting a plaintiff's ability to sue. Congress frequently controls "the class of plaintiffs . . . authorized to sue under [a statute]" by narrowly defining the statutory cause of action. *Id.* at 128; *see also id.* at 129 (noting that Congress didn't make "[a Lanham Act] action . . . available to anyone who can satisfy the minimum requirements of Article III").

After *Lexmark*, a court must "ask whether [this particular plaintiff] has a cause of action under the statute." *Id.* A plaintiff has a cause of action if his interests "fall within the zone of interests protected by the law invoked," and his injuries are "proximately caused by violations of the statute." *Id.* at 129–32 (internal quotation marks omitted).[2]

"Whether a plaintiff comes within the 'zone of interests' is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark*, 572 U.S. at 127 (internal quotation marks omitted).

Like Article III standing, the cause-of-action analysis leaves courts with no prudential discretion. Courts must hear what Congress says they can hear, subject to constitutional limits. "Just as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates." *Id.* at 128 (citations omitted).

So under *Lexmark*, courts conduct a two-step inquiry. They first assess whether a plaintiff has Article III standing. Then, courts look to the statute to see whether the plaintiff has a cause of action and falls within the zone of interests of the statute. The latter inquiry is a routine exercise of statutory interpretation.

If a plaintiff clears these hurdles, the plaintiff can sue. Courts cannot add more requirements, regardless of how prudent they may seem. Judges cannot construct barriers to entry into the federal courthouse based on prudential considerations.

## C.    Bankruptcy Standing After *Lexmark*

*Lexmark* casts a long shadow that darkens the future of bankruptcy standing and the person-aggrieved doctrine.

Courts haven't lost sight of the potential impact of *Lexmark*. Time and again, courts have flagged the impact of *Lexmark* as an open question when it comes to bankruptcy standing. *See, e.g.*, *In re GT Automation*, 828 F.3d at 605 n.1 (noting the open question of "whether, after

---

[2] This analysis looks like standing, because its concepts overlap with those of Article III standing, like injury and causation. Even the Supreme Court had labeled "this inquiry as 'statutory standing' and treated it as effectively jurisdictional" before *Lexmark*. *See Lexmark*, 572 U.S. at 128 n.4. "But ['statutory standing'], too, is misleading, since 'the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the court's statutory or constitutional *power* to adjudicate the case.'" *Id.* (some internal quotation marks omitted) (quoting *Verizon Md. Inc. v. Public Serv. Comm'n of Md.,* 535 U.S. 635, 642–643 (2002)).

*Lexmark*, the standing analysis in bankruptcy cases involves any 'prudential' considerations"); *Matter of E. Coast Foods, Inc.*, 80 F.4th 901, 906 (9th Cir. 2023); *Kiviti v. Bhatt*, 80 F.4th 520, 534 (4th Cir. 2023) ("And whether bankruptcy appellate standing survives the Supreme Court's decision in [*Lexmark*] is an open question."); *Matter of Roman Cath. Church of Archdiocese of New Orleans*, 101 F.4th 400, 408 (5th Cir. 2024) ("Indeed, this court's 'exacting' 'person aggrieved' test may be incompatible with the Supreme Court's decision in *Lexmark*, which cast doubt on the role of prudential standing rules in federal courts.").

That's because bankruptcy standing is "a form of prudential standing" lacking clear origins in the Constitution or federal statutes. *See In re Ray*, 597 F.3d at 875. It is "narrower than Article III standing." *See In re Cult Awareness*, 151 F.3d at 607.

Taking a step back, it is helpful to tell the origin story of the person-aggrieved test. It's a survivor, even though lots of people have contemplated its potential demise.

The story begins with statutory text in the nineteenth century. In a nutshell, the person-aggrieved standard originally had a foothold in the language of the statute. Years ago, the Bankruptcy Code included language that expressly limited standing to persons aggrieved. But Congress amended the statute and repealed that language decades ago. The explicit statutory hook is long gone, but the persons-aggrieved doctrine has stuck around and made itself at home.

The person-aggrieved standard "derives from Section 39(c) of the *former* Bankruptcy Act of 1898." *See In re El San Juan Hotel*, 809 F.2d 151, 154 (1st Cir. 1987) (emphasis added); *see also Fondiller*, 707 F.2d at 443; *DuPage Boiler*, 965 F.2d at 297 (citing *In re El San Juan Hotel* and *Fondiller*).

Under that regime, "[a] *person aggrieved* by an order of a bankruptcy referee [could] . . . file with the referee a petition for review of such order by a judge[.]" *See* 11 U.S.C. § 67(c) (1976) (repealed 1978) (emphasis added). Only "persons aggrieved" could appeal. *See In re Cap. Contracting Co.*, 924 F.3d 890, 896 (6th Cir. 2019) (noting that "'person aggrieved' has long been a term of art signifying who may challenge agency actions") (internal quotation marks omitted).

Courts defined "person aggrieved" in the bankruptcy statute in the now-familiar way. They "read the phrase to require a party to 'be directly and adversely affected pecuniarily by the order of the referee which is challenged.'" *Id.* (quoting *Hartman Corp. of Am. v. United States*, 304 F.2d 429, 431 (8th Cir. 1962)). They also required a bankruptcy appellant to have "his property . . . diminished, his burdens increased or his rights detrimentally affected by the order sought to be reviewed." *See In re Michigan-Ohio Bldg. Corp.*, 117 F.2d 191, 193 (7th Cir. 1941).

The pecuniary-interest and property-burdens-rights standards began as an interpretation of the old statute. But in 1978, Congress gutted the old bankruptcy regime, and "deleted the person-aggrieved text from the statute authorizing appeals." *See In re Cap. Contracting*, 924 F.3d at 896; *see also* 28 U.S.C. § 158; *Matter of Highland Cap. Mgmt., L.P.*, 74 F.4th 361, 366

12

(5th Cir. 2023) ("Congress expressly removed this provision when it enacted the Bankruptcy Code in 1978.").

In 1984, Congress added 28 U.S.C. § 158, which currently governs appeals. But Congress conspicuously dropped the words "person aggrieved" from the statutory text. *See* Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. 98–353, 98 Stat 333 (1984).

Section 158 reads: "The district courts of the United States shall have jurisdiction to hear appeals . . . from final judgments, orders, and decrees . . . and with leave of the court, from other interlocutory orders and decrees[] of bankruptcy judges[.]" *See* 28 U.S.C. § 158(a). The phrase "person aggrieved" is noticeably missing.

The language of the statute doesn't place any restrictions on who can appeal. "No indication is given either in title 11 or title 28 regarding the requisites for standing to appeal an order, judgment, or decree of a bankruptcy court." *See* 1 Collier on Bankruptcy ¶ 5.07 (16th ed. 2026). Nothing in the text suggests that Congress narrowed the funnel and restricted who could appeal.

Even without a textual home in the Bankruptcy Code, the person-aggrieved standard survived during the pre-*Lexmark* era in the Seventh Circuit and its sister circuits. *See, e.g.*, *DuPage Boiler*, 965 F.2d at 297; *Fondiller*, 707 F.2d at 443; *see also In re Cap. Contracting*, 924 F.3d at 896. After Congress amended the statute, courts in the pre-*Lexmark* era continued to hold that "[t]he [practical] need for the [person-aggrieved] rule continue[d] to exist" under the new regime. *See Fondiller*, 707 F.2d at 443.

The textual hook was lost, but courts found it hard to let go. Congress jettisoned the reference to a "person aggrieved" in the statutory text. But to the judiciary, it made no difference. The more things changed, the more they stayed the same.

The reasoning often depended on prudential reasons. *See, e.g.*, *In re Cosmopolitan Aviation Corp.*, 763 F.2d 507, 513 (2d Cir. 1985) ("We believe that this rule sets a *reasonable and practical* threshold for standing and we join the courts that have adopted it.") (emphasis added); *In re Goodwin's Disc. Furniture, Inc.*, 16 B.R. 885, 888 (B.A.P. 1st Cir. 1982) ("The [1898] Act's limitation on the right to appellate review to those parties whose pecuniary interests were directly affected by a bankruptcy court's decision is the *logical and necessary corollary* of appellate standing in the bankruptcy context.") (emphasis added); *In re Jewel Terrace Corp.*, 10 B.R. 1008, 1011 (E.D.N.Y. 1981) ("Section 39(c) with its 'person aggrieved' wording was dropped from the statute. Regardless, this court believes *that there must be a standard* by which to gauge a person's right to appeal and it has therefore adopted the 'person aggrieved' standard used previously under the Act.") (emphasis added); *In re L.T. Ruth Coal Co.*, 803 F.2d 720 (6th Cir. 1986) ("The general consensus . . . seems to be that the . . . 'person aggrieved' test should be applied as a matter of *judge-made law*.") (emphasis added).

Courts continued to believe that bankruptcy standing was necessary. Without it, the bankruptcy machine would screech to a halt, given the number of potentially interested

13

stakeholders. *See In re El San Juan Hotel*, 809 F.2d at 154 ("[Bankruptcy] standing is [still] necessary to insure that bankruptcy proceedings are not unreasonably delayed by protracted litigation that does not serve the interests of either the bankrupt's estate or its creditors. The nature of bankruptcy litigation, with its myriad of parties, directly and indirectly involved or affected by each order and decision of the bankruptcy court, mandates that the right of appellate review be limited to those persons whose interests are directly affected."); *Fondiller*, 707 F.2d at 443 (same); *In re Goodwin's Disc. Furniture*, 16 B.R. at 889 (same).

The earlier standard still made sense to courts, even though Congress didn't reincorporate it. And courts thought that the omission "[wa]s no evidence that Congress intended to alter the right to appellate review by leaving undefined in the Code the requisites for standing," either. *See Fondiller*, 707 F.2d at 443; *In re Goodwin's Disc. Furniture*, 16 B.R. at 888 ("In fact, there is no indication in the Code as to the requisites for standing to appeal. However, there is no basis to conclude that Congress intended to alter the right to appellate review in the manner proposed by the appellant."). "Although the [1978 Act], does not include a similar provision limiting who can appeal, courts continue to apply the person aggrieved standard because Congress did not intend to alter the definition set forth in the prior law." *See In re Ernie Haire Ford, Inc.*, 764 F.3d 1321, 1325 (11th Cir. 2014) (cleaned up).

Importantly, the then-current edition of *Collier on Bankruptcy* (from the early 1980s) adopted this approach, too. *See Fondiller*, 707 F.2d at 443 (citing 1 Collier on Bankruptcy ¶ 3.03[6][b] (15th ed. 1982)); *In re Goodwin's Disc. Furniture*, 16 B.R. at 888 (same).

The judicial indifference to a change in the statutory text seems antiquated now, in an era of textualism. But "[a]t one time, this reasoning might have been viewed as a garden-variety application of the Supreme Court's cases authorizing judicially self-imposed limits on jurisdiction." *See In re Cap. Contracting*, 924 F.3d at 896.

Many courts that readopted the person-aggrieved standard treated the issue casually, sparing few words on the subject. *See, e.g.*, *DuPage Boiler*, 965 F.2d at 297 (adopting *In re El San Juan Hotel* and *Fondiller* without analyzing the statutory text); *In re Cosmopolitan Aviation*, 763 F.2d at 513 (conducting a cursory analysis in one paragraph); *In re Jewel Terrace*, 10 B.R. at 1011 n.3 (devoting only one footnote to the issue).

So, to sum it all up, the Bankruptcy Code previously authorized an aggrieved person to appeal. Congress did away with that language in 1978, and adopted a statute in 1984 with broader language and no express limitation on who could appeal. But courts continued to apply the person-aggrieved standard anyway.

The situation is reminiscent of Wile E. Coyote, after he chases the Road Runner and inadvertently runs off the end of a cliff. The foundation beneath him is gone. But someway somehow, he continues to float there anyway, hovering in the sky without any foothold. At least for a while. One wonders when things will eventually fall back to earth.

The Seventh Circuit has not squarely addressed whether bankruptcy standing survives after *Lexmark*. It came close to the issue a time or two, but didn't have an opportunity to decide

it. *See In re GT Automation*, 828 F.3d at 605 n.1 ("This case concerns Article III standing only, so we do not discuss [*Lexmark*]."); *In re Helmstetter*, 44 F.4th 676, 679 (7th Cir. 2022) (dismissing a bankruptcy appeal for lack of Article III standing).

Other courts have hesitated to apply the rule of bankruptcy standing after *Lexmark*. They typically skirt the issue by ruling that a party lacks Article III standing to appeal, without deciding bankruptcy standing. *See, e.g.*, *In re Cap. Contracting*, 924 F.3d at 897 (6th Cir. 2019) ("We take . . . the route taken by the Seventh Circuit in *GT Automation*."); *E. Coast Foods*, 80 F.4th at 906 ("After the Supreme Court's decision in Driehaus, however, we have returned emphasis to Article III standing. . . . We thus first examine Article III standing, which we find lacking here."); *Helmstetter v. Herzog*, 2021 WL 2948912, at *11 ("The parties' dispute sounds in Article III."); *Roman Cath. Church of Archdiocese of New Orleans*, 101 F.4th at 408 (finding that bankruptcy appellants lacked Article III standing without applying bankruptcy standing's requirements); *but see Mercy Health Network v. Mercy Hosp., Iowa City*, 178 F.4th 449, 453–55 (8th Cir. 2026) (applying the narrower bankruptcy standing concept without addressing *Lexmark*); *In re Schubert*, 2023 WL 2663257, at *3 (Thapar, J.) (applying bankruptcy standing without "decid[ing] whether the person-aggrieved test is still good law" because the parties didn't argue for its abrogation); *but see Matter of Roman Cath. Church of Archdiocese of New Orleans*, 2024 WL 3440466, at *2–4 (5th Cir. 2024) (finding that bankruptcy appellants had Article III standing without applying the additional test of bankruptcy standing). If an appellant lacks Article III standing, then the appeal can be dismissed without relying on the more exacting requirements of bankruptcy standing.[3]

Plenty of circuit courts have doubted the continued vitality of bankruptcy standing and the person-aggrieved standard. *See In re Schubert*, 2023 WL 2663257, at *2–3 (6th Cir. 2023) (Thapar, J.) ("In 1978, though, Congress removed the 'any person aggrieved' language from the Bankruptcy Code. . . . Thus, [under *Lexmark*,] the 1978 amendment almost certainly eliminated the person-aggrieved test as a jurisdictional limit on bankruptcy appeals."); *Matter of Salubrio, LLC*, 2023 WL 3143686, at *5 (5th Cir. 2023) (Oldham, J., dubitante) ("After *Lexmark*, I harbor doubt as to the validity of prudential standing doctrines like the person aggrieved test. That doubt is particularly acute where, as here, the doctrine originated in a statutory requirement that Congress has since repealed and that exists today only because judges revivified it as a matter of federal common law.").

Many courts have called into question whether it survives. But no circuit court has pulled the trigger and held that bankruptcy standing is out the window after *Lexmark*.

---

[3] Some courts have found other ways to avoid using bankruptcy standing. In cases where "the appellant is the party below and remains integrally connected to the issues on appeal," "the purpose of the [bankruptcy standing] doctrine – limiting the appeals of remote non-parties – is not implicated," and the doctrine doesn't apply. *See In re Sisk*, 962 F.3d 1133, 1143 (9th Cir. 2020) (internal quotation marks omitted); *see also Trantham v. Tate*, 112 F.4th 223, 234 (4th Cir. 2024) (applying *In re Sisk*'s reasoning in similar circumstances). Wilson and Dass weren't parties below, so that logic doesn't apply here.

The tally is lopsided. So far, four circuit courts have held that bankruptcy standing continues to apply, even after *Lexmark*. *See Highland Cap. Mgmt.*, 74 F.4th at 368–69; *Matter of Petrone*, 754 F. App'x 590, 591 (9th Cir. 2019); *In re Peeples*, 880 F.3d 1207, 1213 (10th Cir. 2018); *In re Ernie Haire Ford*, 764 F.3d at 1325 n.3.

Courts have suggested potential avenues for the doctrine to survive.

One path adopted by the Fifth Circuit narrows *Lexmark* to its context. *See Highland Cap. Mgmt.*, 74 F.4th at 368 (finding "*Lexmark* to reach only circumstances analogous to those at issue in *Lexmark*, rather than broadly modifying – or undermining – *all* prudential standing concerns, such as the one animating the 'person aggrieved' standard in bankruptcy appeals") (emphasis in original). Under this view, *Lexmark* applies only to the task of defining statutory causes of action. But the bankruptcy standing inquiry is something else. *Id.* at 369 ("*Lexmark* does not expressly reach prudential concerns in bankruptcy appeals and brought no change relevant here.").

Other circuit courts have tried to retrofit bankruptcy standing as a variation of the zone-of-interests test. Those courts have reinterpreted bankruptcy standing as "reflect[ing] a zone-of-interests analysis that is consistent with *Lexmark*[.]" *See In re Schubert*, 2023 WL 2663257, at *4 (Moore, J., concurring); *see also In re Peeples*, 880 F.3d at 1214 (recasting bankruptcy standing as a "'stringent' zone-of-interests requirement . . . for appeals from bankruptcy-court orders") (quoting *In re Alpex Comput. Corp.*, 71 F.3d 353, 357 n.6 (10th Cir. 1995)); *Matter of Petrone*, 754 F. App'x at 591; *In re Ernie Haire Ford*, 764 F.3d at 1325.

Courts have trekked down multiple paths to reach this conclusion. The Ninth, Tenth, and Eleventh Circuits have preserved bankruptcy standing in its broadest form, and continue to apply the person-aggrieved test as a generalized standard that defines the zone of interests applicable to all bankruptcy appeals. *See Petrone*, 754 F. App'x at 591 ("[T]he 'person-aggrieved' test identifies appellants 'whose interests fall within the zone of interests protected by the law invoked,' here, the Bankruptcy Code.") (quoting *Fondiller*, 707 F.2d at 443); *In re Ernie Haire Ford*, 764 F.3d at 1326 ("[A] person is not 'aggrieved' when the interests harmed by a court order are not interests the Bankruptcy Code seeks to protect or regulate."); *In re Peeples*, 880 F.3d at 1214 (portraying the property-burdens-rights standard under the person-aggrieved test as a "general standard" defining the zone of interests "for appeals from bankruptcy-court orders"); *see also In re Schubert*, 2023 WL 2663257, at *7 (Moore, J., concurring) ("[T]he person-aggrieved standard, when properly applied, amounts to a zone-of-interests test that asks whether the bankruptcy appellant's 'interests fall within the zone of interests protected by the law invoked.'") (quoting *Lexmark*, 572 U.S. at 129 (internal quotation marks omitted)).

The Tenth Circuit takes things a step further. It supplements the general person-aggrieved test with a narrower focus on the Bankruptcy Code sections underlying an appeal, and those sections' zone of interests. *See In re Peeples*, 880 F.3d at 1211–14 (observing that the person-aggrieved test was "arguably me[t]," but holding that the appellants did not meet the "even more limited" zone of interests of the automatic-stay provisions implicated by the appeal, 11 U.S.C. §§ 362(a) and 362(k)); *see also In re Schubert*, 2023 WL 2663257, at *7 (Moore, J.,

concurring) (examining the zone of interests of the "provision of the Bankruptcy Code under which the [appellants] bring their challenge").

This approach directs courts to examine the text of the specific Code sections to deduce the relevant zone of interests. *See In re Peeples*, 880 F.3d at 1214 (observing that "the automatic stay is for the sole benefit of the debtors' estate," but the appellant did not seek to use section 362(a) to benefit the estate); *id.* at 1215–16 (holding that section 362(k) "suggests a broader reach than § 362(a)" and "creates a cause of action for debtors and creditors," but that the appellant was harmed merely because he had to defend against litigation, not in his capacity as a creditor); *see also In re Schubert*, 2023 WL 2663257, at *7–8 (Moore, J., concurring) (examining the estate-value-maximizing "purpose and policy" of the Bankruptcy Code's abandonment provision, 11 U.S.C. § 554, and finding that the appellants' "sole interest in this case is staving off the threat of litigation" did not meet that section 554's purposes).

In other words, the text provides a basis to extrapolate a broader purpose. It feels a little like textual purposivism. The zone of interests is based on the text, but these courts use a small bit of text as a launchpad to the purposivist moon.

Putting it all together, the lay of the land for bankruptcy standing after *Lexmark* is unsteady. No circuit court has abrogated bankruptcy standing (yet).

In *Lexmark*, the Supreme Court disarmed lower courts as prudential guardians at the doors of the federal courthouse. In light of *Lexmark*, bankruptcy standing might someday have a going-out-of-business sale.

In the meantime, four circuit courts have held that bankruptcy standing survived *Lexmark*. The Fifth Circuit cabined *Lexmark* to statutory causes of action, and refused to extend it to bankruptcy standing. The Ninth, Tenth, and Eleventh Circuits held that the person-aggrieved test continues to apply as a generalized zone-of-interests test for bankruptcy appeals. And the Tenth Circuit further held that, after *Lexmark*, courts should also look to the Bankruptcy Code sections underlying an appeal to find and apply a tailored zone of interests.[4]

But for present purposes, the key point is that the Seventh Circuit has not yet had a chance to weigh in.

---

[4] There are other potential theories of bankruptcy standing's survival after *Lexmark*. For example, Judge Stras recently connected the doctrine to third-party standing. *See Mercy Health*, 178 F.4th at 456 (Stras, J., concurring). His theory likely doesn't help Wilson and Dass. But it's worth noting that Judge Stras thought that bankruptcy standing "may have a sturdier foundation than we think. Unlike other 'prudential' justiciability doctrines, this one is 'closely related to Article III concerns,' if not partially rooted in its 'case-or-controversy requirement.'" *Id.* (quoting *June Med. Servs. LLC v. Russo*, 591 U.S. 299, 363 (2020) (Thomas, J., dissenting)).

17

### D. Applying *Lexmark* to Bankruptcy Standing

*Lexmark* gives lower courts good reason to question whether bankruptcy standing survives. If it survives at all, it must fit within the boundaries set by *Lexmark*. The statutory text is what matters. Prudential considerations from the judiciary cannot provide a lifeline.

Bankruptcy standing's person-aggrieved test doesn't come from the Constitution, or from a statute. It lost its textual hook decades ago, when Congress cut it. Since then, Congress hasn't supplemented the appeals statute or the Bankruptcy Code with text that can support the broad restriction of bankruptcy appeals only to persons aggrieved.

Even so, this Court doesn't write on a blank slate. Precedent compels this Court to apply the person-aggrieved test in this case. In years past, the Seventh Circuit has recognized bankruptcy standing. So it is up to the Seventh Circuit to decide whether that line of precedent remains in full force.

Bankruptcy standing and the person-aggrieved standard are the longstanding law of all circuits, including the Seventh Circuit. *See In re Schubert*, 2023 WL 2663257, at *4 n.1 (Moore, J., concurring) ("All circuits employ an identical definition."). The doctrine was around before the 1978 amendments, and it survived them everywhere – including in the Seventh Circuit – too. *See, e.g.*, *DuPage Boiler*, 965 F.2d at 297; *Fondiller*, 707 F.2d at 443.

Courts around the country still apply the person-aggrieved test after *Lexmark* without even mentioning *Lexmark*. *See, e.g.*, *In re Neira*, 14 F.4th 60, 66 (1st Cir. 2021) ("It is well-settled that only a 'person aggrieved' has standing to appeal from a final bankruptcy court order."). If *Lexmark* was an extinction-level event for prudential considerations, then the doctrine of bankruptcy standing somehow survived unscathed.

Many courts have cast doubt on bankruptcy standing, but no circuit has abandoned it yet. On the contrary, four circuits have reaffirmed the person-aggrieved test after *Lexmark*. *See Highland Cap. Mgmt.*, 74 F.4th at 368–69; *Matter of Petrone*, 754 F. App'x 590, 591 (9th Cir. 2019); *In re Peeples*, 880 F.3d 1207, 1213 (10th Cir. 2018); *In re Ernie Haire Ford*, 764 F.3d at 1325 n.3.

The simple reality is that the Seventh Circuit has stuck with the person-aggrieved test, even after *Lexmark*. Only the Seventh Circuit (and the Supreme Court) can change Seventh Circuit case law. *See Highland Cap. Mgmt.*, 74 F.4th at 368 ("But it is settled that for a Supreme Court decision to override a Fifth Circuit case, the decision must *unequivocally* overrule prior precedent; mere illumination of a case is insufficient, that an intervening change in the law cannot be a mere hint of how the Supreme Court might rule in the future.") (emphasis in original) (cleaned up).

The Tenth Circuit's approach to bankruptcy standing might get some traction. As a reminder, the Tenth Circuit in *Peeples* supplemented the person-aggrieved test with a tailored examination of the zone of interests of the Code sections underlying an appeal. *See In re*

18

*Peeples*, 880 F.3d at 1211–14. In other words, the text at issue in a bankruptcy-court decision defines the relevant zone of interests for who can appeal that decision.

That approach could survive *Lexmark*. *Lexmark* itself suggests that lower courts have room to search within a statute for clues as to the proper zone of interests to apply. *See Lexmark*, 572 U.S. at 129–30; *id.* at 127 ("Whether a plaintiff comes within the 'zone of interests' is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim.") (internal quotation marks omitted).

The zone of interests can be broad, and "certain statutes will show that they protect a more-than-usually expansive range of interests." *Id.* (cleaned up). That's because the zone of interests is governed by the purposes of a law, as revealed by the text.

*Lexmark* looked to the text of the cause of action at issue, but also looked to the purposes of the Lanham Act more broadly (again, as revealed by the statutory language). That task was easier than usual. "Identifying the interests protected by the Lanham Act, however, requires no guesswork, since the Act includes an 'unusual, and extraordinarily helpful,' detailed statement of the statute's purposes." *Id.* at 131 (quoting *H.B. Halicki Productions v. United Artists Communications, Inc.*, 812 F.2d 1213, 1214 (9th Cir. 1987)).

Hidden in that long sentence is an insinuation that many statutes might not have such a clear statement of their purposes. The Supreme Court seemingly suggested that "[i]dentifying the interests protected by [a statute]" *could* "require[] guesswork." *Id.* "Guesswork" could justify a broader look at the statutory text and structure.

*Lexmark* relied on the statutory text, so courts can look at the language of the Code provisions underlying an appeal to define the relevant zone of interests. *See In re Peeples*, 880 F.3d at 1213–1216 (analyzing 11 U.S.C. §§ 362(a) and 362(k) individually to identify their zones of interests); *In re Schubert*, 2023 WL 2663257, at *7–8 (Moore, J., concurring) (analyzing the "purpose and policy" of 11 U.S.C. § 554). Courts can simply use the "traditional tools of statutory interpretation." *See Lexmark*, 572 U.S. at 127. That task runs a low risk of prudential policy-making.

Putting all of that aside, party presentation is an issue here, too. The parties do not explicitly argue that *Lexmark* abrogated the bankruptcy-standing doctrine. *See generally* Mtn. to Dismiss for Lack of Standing (Dckt. No. 7); Appellants' Resp. to Mtn. to Dismiss (Dckt. No. 9); Appellee's Reply (Dckt. No. 13).

Instead, they debate about how *Lexmark* applies. Both sides invoke bankruptcy standing as distinct from Article III standing. *See* Mtn. to Dismiss for Lack of Standing, at 8 (Dckt. No. 7); Appellants' Resp. to Mtn. to Dismiss, at 5 (Dckt. No. 9) (calling bankruptcy standing "prudential"). And the City noted that *Lexmark* has affected bankruptcy standing. *See* Appellee's Reply, at 6 n.2 (Dckt. No. 13).

19

Maybe some other case will raise whether bankruptcy standing survived *Lexmark*. But the parties didn't raise it, so this Court won't decide it. *See In re Schubert*, 2023 WL 2663257, at *3 (6th Cir. 2023) (Thapar, J.) ("The parties haven't briefed this [*Lexmark*] issue. Why? Because the lenders haven't asked us to abrogate the person-aggrieved test. . . . And because they have not asked us to abrogate the test, the Schuberts have had no opportunity to explain what, if anything, might replace it. It may well be that the 1978 amendment ended the test for good. Or some other statutory basis may require imposing a new zone-of-interest test in its place. Either way, the question has not been presented, and we have no briefing on the issue. . . . Since the lenders forfeited any challenge to the doctrine, we need not decide whether the person-aggrieved test is still good law or even whether it's jurisdictional. Instead, all we need to do is consider the lenders' argument that they survive the test under our existing precedent. They do not.").

In sum, the Court will apply both Article III standing and bankruptcy standing in this case. For the bankruptcy-standing inquiry, the Court will apply the person-aggrieved test, consistent with Seventh Circuit precedent. And it will look at the zone of interests circumscribed by the Bankruptcy Code sections underlying this appeal.

## III.     The Standing of the Appellants

Wilson and Dass must have Article III standing and bankruptcy standing to bring an appeal. The parties have suggested two potential theories for how they meet these standards. Both fail.

As equity holders, Wilson and Dass do not have Article III standing. As defendants in an avoidance action, they do have Article III standing, but they don't have bankruptcy standing.

### A.     Standing as Equity Holders

One possibility is that Wilson and Dass have Article III standing as equity holders. Ownership could give rise to standing in some cases, but not in the case at hand. Based on the posture of this case, the fact that Wilson and Dass have an ownership in the debtors does not, in and of itself, give them standing to appeal.

At one point, the City believed that Wilson and Dass claimed to have standing as equity holders. *See In re B.A.S.S.*, Resp. to Mtn. for Stay Pending Appeal, at 8 (Dckt. No. 756) ("Wilson and Dass are only equity owners in 2 entities, and they must show that it is 'likely,' and not just 'theoretically possible,' that they would receive some distribution . . . to have either Article III or bankruptcy standing.").

But Wilson and Dass later clarified that they are not relying on their status as equity holders to establish bankruptcy standing. *See In re B.A.S.S.*, Reply, at 9 (Dckt. No. 757) ("Wilson and Dass are not objecting as equity holders hoping for a distribution, but rather as potential defendants in the avoidance actions that the City seeks to pursue through derivative standing. Their standing is based on their status as potential defendants, not as equity holders."). They made the same concession before this Court. *See* Appellants' Resp. to Mtn. to Dismiss (Dckt. No. 9) ("Appellants, however, frame their standing not as equity holders seeking

20

distribution, but as prospective defendants whose legal exposure is directly expanded by the derivative-standing order.").

An equity-holder theory of standing wouldn't get them very far in this case, either. Wilson and Dass wouldn't have a redressable injury.

Equity holders have a residual claim to the estate's assets in bankruptcy. They get what's left after all creditors are paid in full. *See United States v. Rogan*, 639 F.3d 1106, 1108 (7th Cir. 2011) (Easterbrook, J.) ("Equity investors are residual claimants; they get only what is left after debts have been paid."). They feed last.

When the expected payout is positive, equity holders can suffer an injury by bankruptcy-court orders that diminish the residual value of the estate. An order that squanders the property of the estate reduces the value of equity holders' claims. That injury can give rise to standing to appeal a bankruptcy-court order. *See In re Cult Awareness*, 151 F.3d at 608 ("If the debtor can show a reasonable possibility of a surplus after satisfying all debts, then the debtor has shown a pecuniary interest and has standing to object to a bankruptcy order.").

In a typical bankruptcy, nothing remains for the equity holders. Their interests are wiped out.

When there is no reasonable possibility of surplus, the estate's residuum has no expected value. Equity holders will receive nothing regardless of the bankruptcy-court order. So, there's no chance that a reversal will cure anything – either way, the equity holders are left holding the bag.

When there is no expected payout, equity holders do not have Article III standing to appeal a bankruptcy-court order, because their purported injury is not redressable. *See In re Helmstetter*, 44 F.4th at 679 ("Standing is lacking if it is merely speculative – as opposed to likely – that the plaintiff's injury would be redressed by a favorable decision.") (internal quotation marks omitted). An order doesn't injure an equity holder when the equity holder isn't going to get anything anyway.

Redressability is a common problem for residual claimants seeking to appeal a bankruptcy-court order. Debtors, who are also residual claimants, "'often lack standing to challenge bankruptcy orders because no matter how the estate's assets are disbursed by the trustee, no assets will revert to the debtor,' and therefore, it is unlikely that a favorable decision from this court would redress the debtor's injury." *Id.* (quoting *In re GT Automation*, 828 F.3d at 604) (cleaned up).

In other words, debtors with no chance of recovery cannot "'realize an[] economic benefit from a potential reversal.'" *See In re GT Automation*, 828 F.3d at 604 (quoting *In re Stinnett*, 465 F.3d at 315).

Here, the bankruptcy court found that "Ms. Dass and Ms. Wilson have no likelihood of sharing in any distribution from the estate because their equity interests would come behind the

21

interests of unsecured and other creditors, and the court is of the opinion that there is absolutely no likelihood that unsecured creditors in this case will be paid in full." *See* 1/13/26 Tr., at 4:18-24 (Dckt. No. 6-1). Wilson and Dass haven't argued that those factual findings are erroneous, and the Court sees no clear error.

Wilson and Dass's chance of recovery is zero with or without the derivative-standing order. A favorable decision from this Court wouldn't alter that reality. So, any injury as an equity holder is not redressable.

## B. Standing as Defendants

Instead of relying on their status as equity holders, Wilson and Dass hang their hats on their status as defendants in the avoidance actions.

They claim an injury because the order from the bankruptcy court opened the door to a lawsuit against them filed by the City. As they see things, the derivative-standing order unlawfully enabled the City to bring avoidance actions. And the lawsuits injured Wilson and Dass because they need to spend time and money defending the City's illegitimate lawsuits.

This Court will address Article III standing, and then bankruptcy standing.

### 1. Article III Standing

The litigation-target theory is enough to get over the hump for standing under Article III. The bankruptcy-court order can give rise to standing if it inflicts (1) a concrete, imminent injury that is (2) fairly traceable to the derivative-standing order itself and (3) is likely to be redressed by this Court's reversal of the bankruptcy court's decision. *See Silha*, 807 F.3d at 173.

Standing is different than the merits. The lawfulness of the transfer of authority from the trustee to the City is a merits question, not a standing question. For present purposes, this Court accepts Wilson and Dass's view of the merits.

For now, the question is not whether the transfer of authority was lawful. That's a merits question. The question is whether the order authorizing the transfer inflicted an injury, taking it as a given that the transfer was unlawful. That's a standing question.

The issue is whether Wilson and Dass suffered an injury from the derivative-standing order. Wilson and Dass argue that any avoidance action by the City is illegitimate because the City lacks the authority to bring the action in the first place. In their view, Seventh Circuit case law precludes the City from exercising derivative standing on behalf of the estate.

As they see things, the order inflicted an injury because they have to defend themselves and respond to the lawsuits. The Court agrees.

Expending time, money, and other resources to defend against an illegitimate lawsuit can constitute an injury for Article III purposes. "The costs to defend a lawsuit can be an injury-in-

22

fact for purposes of Article III." *Crabtree v. Experian Info. Sols., Inc.*, 948 F.3d 872, 880 (7th Cir. 2020); *see also Choice v. Kohn L. Firm, S.C.*, 77 F.4th 636, 641 (7th Cir. 2023) (Hamilton, J., dissenting) ("The expense of hiring a lawyer to defend a baseless or illegal lawsuit is a concrete injury."); *see also Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 111 (2025) ("Monetary costs are of course an injury.") (internal quotation marks omitted). The same goes for responding to costly Rule 2004 examination inquiries.

Defining the injury here can get a little tricky. Sometimes the need to defend a lawsuit can inflict an injury and give rise to standing. But defining the injury so broadly in this particular case wouldn't work, because it would face redressability problems. After all, if this Court reversed the bankruptcy court and vacated the order, then the trustee could sue Wilson and Dass on behalf of the estate. So Wilson and Dass could get sued either way.

The only workable definition of an injury in the case at hand is a definition that ropes in the fact that the City filed the lawsuit. The injury here isn't the existence of a lawsuit. The injury is the existence of a lawsuit *brought by the City*.

The question is whether handing the keys to the City inflicted an injury. It doesn't matter that the order itself did not compel a lawsuit. And it makes no difference that the City had not yet filed a lawsuit at the time of the appeal. Everyone knew what was coming.

Lawsuits were imminent at the time of appeal. *See* Appellants' Resp. to Mtn. to Dismiss, at 4 (Dckt. No. 9). The City had telegraphed its intentions to go after Wilson and Dass in its motion for derivative standing. *See In re B.A.S.S.*, Mtn. for Derivative Standing (Dckt. No. 724, at 7–10 of 19).[5]

The City's message didn't have a lot of nuance, and didn't require much translation. The City told the bankruptcy court that it had uncovered transfers to Wilson and Dass that violated state law, and were void. *Id.* ("In February of 2024, the City issued citations to discover assets to each of the Debtors and several affiliated entities, and then issued third-party citations to Wilson and Dass on those judgments. . . . [T]he Debtors, Wilson, and Dass . . . continued to transfer funds in violation of state law freezing their assets when the citations were served. Notably, many of these transfers that were in direct violation of the state law freeze were to the Debtors' lawyers to defend against the very citations that they were violating. All these transfers were in violation of the pending citations and thus void.") (quoting the City's filing).

The whole point of the request for derivative standing was to get the authority to sue Wilson and Dass, among others. Avoidance actions were on the near horizon, and simply needed the blessing of the bankruptcy court to come to fruition.

---

[5] The imminent injury here is analogous to Article III injuries that courts recognize in the context of potential prosecutions. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (explaining that the potential targets of law enforcement actions can sue preemptively when "circumstances . . . render the threatened enforcement sufficiently imminent," and a plaintiff "alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder").

The likelihood of avoidance actions created a concrete and imminent injury, rather than a conjectural one. Avoidance actions and examinations were almost certainly in store once the City took over the reins.

That's exactly how things played out. Soon after it received the green light, the City fired off three avoidance actions naming Wilson and Dass as defendants. *See* Mtn. to Stay, at 2 (Dckt. No. 11).

The Sixth Circuit faced a similar situation not long ago. The Sixth Circuit held that lenders had Article III standing to appeal an order from the bankruptcy court that enabled the debtors to pursue claims against the lenders in state court. *See In re Schubert*, 2023 WL 2663257, at *1–2 (Thapar, J.).

*Schubert* involved reopening a bankruptcy case and resurrecting old claims. A decade after filing for bankruptcy, the debtors sued their mortgage lenders in state court for charging excessive fees. The lenders defended the case on the grounds that any such claim belonged to the estate, not the debtors. So the debtors went back to bankruptcy court, and asked for authorization to bring the claims.

A bankruptcy-court order directed the estate to abandon a mortgage claim that it could have brought against the debtors' lenders. *Id.* at *1. After abandonment, the claim returned to the debtors' hands, allowing the debtors to litigate the claims instead. *Id.* The lenders appealed that decision.

The Sixth Circuit found that the lenders had suffered a cognizable Article III injury. The bankruptcy court's order opened the door to potential litigation against the lenders, and thus satisfied the need for an injury.

"The threat of certainly impending litigation can satisfy the injury requirement. And here, litigation isn't just *im*pending, it's already pending – and it's plainly traceable to the Schuberts. The Schuberts have filed their claim against the lenders in Ohio court. All they need is the bankruptcy court's approval to proceed. That certainly gives the lenders a concrete interest in the bankruptcy proceedings. And these proceedings can also give the lenders redress. An order consigning the claim to the bankruptcy estate would halt the Ohio lawsuit in its tracks. That's enough to establish standing." *Id.* at *2 (citation omitted) (emphasis in original).

That's similar to the situation at hand. The order in *Schubert* transferred a mortgage claim from the estate to the debtors, enabling the debtors to sue the lenders. Here, the derivative-standing order shifted the authority to pursue avoidance actions against Wilson and Dass from the estate to the City. As in *Schubert*, Wilson and Dass were injured by that court-ordered transfer of litigation authority.

Strictly speaking, the order from the bankruptcy court merely authorized the City to bring avoidance actions on behalf of the estate. The bankruptcy court didn't compel the City to sue the appellants. Instead, the order was facially neutral, and simply handed the keys to the City and put it in the driver's seat.

24

Viewed narrowly, maybe the transfer of authority didn't inflict an injury on anyone. After all, the City didn't have to bring an action against anyone. But everyone knew that it was only a matter of time until the City sued Wilson and Dass. After all, that was the whole point.

The issue is reminiscent of a scene from *The Hangover*, where a police officer hands a taser to an eager, trigger-happy child. The kid was all-too-willing to take a shot at the beleaguered, rag-tag collection of pretrial detainees. In some sense, maybe the act of handing the taser to the child, in and of itself, didn't inflict an injury. But everyone knew what was coming. And an injury didn't take long to arrive.

The situation at hand satisfies the need for an injury in fact. With injury established, traceability and redressability are relatively simple.

The concrete injury of defending against the illegitimate lawsuits is fairly traceable to the derivative-standing order. After all, the bankruptcy court granted the City derivative standing. And the Court already explained that the suits were imminent. Once the City had derivative standing, it would sue Wilson and Dass.

Also, the injury is redressable by an order of this Court. If this Court reversed the bankruptcy court, that would wipe the slate clean and eliminate the City's standing to sue.

Vacating the order would fix Wilson and Dass's injuries, which come from the City's role in the avoidance-action litigation. The estate could still sue, but Wilson and Dass's fundamental problem with the litigation – that the *City* is the one suing – would be fixed.

Putting it all together, Wilson and Dass's injuries are fairly traceable to the bankruptcy court's order, and redressable by this Court. So Wilson and Dass have Article III standing to appeal.

### 2. Bankruptcy Standing

But the other roadblock stands in the way. Wilson and Dass do not have bankruptcy standing, so they can't appeal.

For the sake of completeness, this Court will follow the two-tiered approach to bankruptcy standing adopted by *Peeples* and other courts. *See In re Peeples*, 880 F.3d at 1213–16; *In re Schubert*, 2023 WL 2663257, at *6 (Moore, J., concurring). The Court will first apply the broader, traditional person-aggrieved standard. Then, it will look at the specific Code sections underlying this appeal – the avoidance action provisions – to identify and apply a tailored zone of interests.

As a reminder, the person-aggrieved test requires Wilson and Dass to show that the order "directly and adversely affect[s]" their pecuniary interests by "demonstrat[ing] that the order diminishes [their] property, increases [their] burdens, or impairs [their] rights." *See In re Holly Marine*, 669 F.3d at 800 (internal quotation marks omitted); *see also In re Ray*, 597 F.3d at 874 (internal quotation marks omitted).

25

The key word is "directly." The derivative-standing order did affect Wilson and Dass's interests. The order will burden them by requiring them to spend time and money defending the avoidance actions. That's why they have Article III standing.

But that's not enough under the person-aggrieved standard. Any impact on them is indirect, not direct. Wilson and Dass cannot demonstrate that the bankruptcy court's order had a *direct*, adverse effect on their pecuniary interests. So they are not aggrieved persons within the meaning of bankruptcy standing.

Numerous courts have rejected the threat of adversarial litigation as a basis for bankruptcy standing because any pecuniary effect is indirect and delayed. Litigation expenses alone do not satisfy the person-aggrieved standard. *See In re LTV Steel Co., Inc.*, 560 F.3d 449, 453 (6th Cir. 2009) ("Although that order paved the way for the ACC to sue him, we are aware of no court that has held that the burden of defending a lawsuit, however onerous or unpleasant, is the sort of direct and immediate harm that makes a party 'aggrieved' so as to confer standing in a bankruptcy appeal."); *In re Black Elk Energy Offshore Operations, LLC*, 114 F.4th 343, 351 (5th Cir. 2024) ("Merely because the extension orders permitted the Trustee to pursue a claim against the [appellants] does not mean the orders directly harmed them. '[A] bankruptcy order court allowing litigation to proceed against an adversary defendant does not make that defendant a party aggrieved.'") (quoting *In re Wigley*, 886 F.3d 681, 685 (8th Cir. 2018)) (citation omitted) (alterations in original); *In re Trailer Source, Inc.*, 555 F.3d 231, 247 (6th Cir. 2009) (Rogers, J., dissenting) ("First, it is well established that parties are not aggrieved by an order granting a creditor derivative standing when their interest in the order is as party defendants in the resulting adversary proceeding."); *Moran*, 2006 WL 3253128, at *5 ("[T]here are no cases which support the argument that litigation, whether real or potential, makes someone a 'person aggrieved' for standing purposes."); *Fondiller*, 707 F.2d at 443 ("The order authorized [a special counsel's] employment for the exclusive purpose of representing the trustee in an attempt to recover assets allegedly concealed by appellant and the debtor. Thus, appellant's only demonstrable interest in the order is as a potential party defendant in an adversary proceeding. As such, she is not a 'person aggrieved' by [the counsel's] appointment."); *In re El San Juan Hotel*, 809 F.2d at 155 ("We interpret *Fondiller* to hold that a debtor, contesting a bankruptcy court order, whose only interest or burden is as a future party defendant, does not qualify as an 'aggrieved person.' [The appellant's] interest in the order [in this case] is also as a party defendant and is no greater than that of the appellant's in *Fondiller*. . . . The [appellant] does have an interest in defending himself against liability, but the order in question does not prevent [him] from doing just that, or from asserting any claims or defenses he may have, including a motion for summary judgment."); *Travelers Ins. Co. v. H.K. Porter Co.*, 45 F.3d 737, 743 (3d Cir. 1995) ("Consistent with the view that appeal from bankruptcy proceedings is denied to marginal parties in bankruptcy proceedings who face potential harm incident to the bankruptcy court's order but are not directly affected, courts have recognized that an order which simply allows a lawsuit to go forward does not necessarily 'aggrieve' the potential defendant for purposes of appellate standing.") (internal quotation marks omitted); *Opportunity Fin., LLC v. Kelley*, 822 F.3d 451, 458 (8th Cir. 2016) (holding that potential defendants in avoidance actions enabled by the consolidation of two bankruptcy estates could not appeal the bankruptcy order because "any potential pecuniary harm . . . is several steps removed and not a 'direct' pecuniary impact. . . . Several steps must occur before the [appellants] suffer a pecuniary harm: [The estate] must

26

prevail in the avoidance actions, the [appellants] must pay the judgment in full, and then they must file a valid proof of claim against the consolidated estate"); *In re Schubert*, 2023 WL 2663257, at *3 (Thapar, J.) (holding that "under our precedent, staving off the threat of litigation doesn't count" as "a direct financial stake in the appeal's outcome"); *In re Schubert*, 2023 WL 2663257, at *5 (Moore, J., concurring) ("Instead, the lenders argue that the abandonment order harms them by requiring them to defend themselves against the Schuberts' state-court litigation. Our decisions, in line with those of other federal courts of appeals and bankruptcy courts, have consistently held that such a litigation-related harm does not suffice to make one a 'person aggrieved.'") (citations omitted).

The string cite of cases could stretch on like Hadrian's Wall. Time and again, courts have rejected the notion that defending a claim is enough to create bankruptcy standing.

As the Eleventh Circuit observed, courts widely hold that a desire to avoid getting sued cannot satisfy the person-aggrieved standard. "A number of our sister circuits have held that bankruptcy court orders that merely allow adversary proceedings to move forward do not cause adversary defendants the type of direct harm necessary to satisfy the person aggrieved standard. We agree that a party is not aggrieved, for the purposes of appealing from a bankruptcy court order, when the only interest allegedly harmed by that order is the interest in avoiding liability from an adversary proceeding." *See In re Ernie Haire Ford*, 764 F.3d at 1325–26 (citations omitted).

Any such harm is too indirect to give rise to bankruptcy standing, as the Eleventh Circuit explained. "This is so because an order subjecting a party to litigation, or the risk thereof, causes only *indirect* harm to the asserted interest of avoiding liability. Orders allowing litigation to go forward do not burden a party's ability to defend against liability; they simply require parties to exercise that ability. Such an effect does not constitute the direct harm necessary to satisfy our person aggrieved standard." *Id.* at 1326 (emphasis in original).

Putting it all together, litigation costs and expenses can give rise to Article III standing. But they aren't enough to give rise to bankruptcy standing under the person-aggrieved standard.

Based on that wall of case law, Wilson and Dass are not persons aggrieved by the derivative-standing order, even though it authorized litigation against them. The order itself did not inflict the kind of direct, pecuniary harm required to create bankruptcy standing. Their defense costs are merely collateral effects of the order at issue.

The order itself didn't directly diminish Wilson and Dass's property, or increase their burdens, or impair their rights. To do so, the order would need to affect the ultimate issue of liability in some way, which is the real, direct harm from litigation and within the scope of bankruptcy standing.

The derivative-standing order simply decided who can sue and how soon, not whether the suit will be successful. The identity of the plaintiff has little to do with liability.

Wilson and Dass also lack standing under a narrower zone-of-interests analysis tailored to the Bankruptcy Code sections implicated by this appeal.

As a starting point, it seems too narrow to focus exclusively on the statutory language about appeals. When deciding the zone of interests for appellate standing, looking exclusively at the language of the provision about appeals might be too narrow of a focus. *See* 28 U.S.C. § 158. Courts presumably should look to the zone of interests of the underlying issue or cause of action, too. The zone of interests in an appeal should consider what the appeal is *about*.

No specific Code section defines the standard for when creditors may obtain derivative standing to litigate avoidance actions for the estate. That's because derivative-standing orders are creatures of equity, not statute, and subject to bankruptcy courts' discretion. *See* 5 Collier on Bankruptcy ¶ 554.07 (16th ed. 2026) ("Before a creditor may exercise the strong arm powers of section 544, the permission of the bankruptcy court must first be obtained. Without such permission, a creditor does not have standing."); *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001) ("[W]e hold that a creditors' committee may sue on behalf of the debtors, with the approval and supervision of a bankruptcy court, not only where the debtor in possession unreasonably fails to bring suit on its claims, but also where the trustee or debtor in possession consents. In the latter situation, however, suit by the creditors committee must be necessary and beneficial to the resolution of the bankruptcy proceedings."); *see also* 12/16/25 Tr., at 18:21-22 (Dckt. No. 6) ("I do think there has to be practicality involved here[.]") (quoting the bankruptcy court); *id.* (balancing the equities requiring the City to take over the suits).

However, the Bankruptcy Code does enumerate the avoidance powers that the City now wields on behalf of the estate. *See* 11 U.S.C. §§ 541–45, 547–50; 12/16/25 Order, at ¶ 1 (Dckt. No. 1-3) (granting the City "derivative standing to investigate and prosecute all avoidance actions and other causes of actions of the estates under §§ 541–545 and 547–550 of the Bankruptcy Code, and all incorporated or related legal claims whether under state law, federal law, or otherwise"). The Court can look to these provisions to deduce a zone of interests governing Wilson and Dass's appeal.

The parties haven't identified which specific provisions the City invokes against Wilson and Dass. But it appears that the City seeks to avoid the transfers in question as violations of state-law citations to discover assets. *See In re B.A.S.S.*, Mtn. for Derivative Standing (Dckt. No. 724, at 10 of 19) ("[The debtors and Wilson and Dass] continued to transfer funds in violation of state law freezing their assets when the citations [to discover assets] were served."); *see also Radio One, Inc. v. Direct Media Power, Inc.*, 2018 WL 4685470, at *7 (N.D. Ill. 2018), *aff'd sub nom. Urb. One, Inc. v. Direct Media Power, Inc.*, 813 F. App'x 227 (7th Cir. 2020) ("To protect assets from improper transfers, Illinois permits a citation to discover assets to include, as it does in the DMP Citation, a restraining provision that 'prohibit[s] the party to whom it is directed from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from the enforcement of the judgment therefrom . . . until the further order of the court or the termination of the proceeding, whichever occurs first.'") (quoting 7315 ILCS 5/2-1402(f)(1)) (alterations in original).

28

As alleged, the citation violations likely qualify as fraudulent transfers, which are avoidable by the estate under two Bankruptcy Code sections.

Section 544(b) allows the estate to recover transfers deemed fraudulent under state law. *See* 11 U.S.C. § 544(b); 5 Collier on Bankruptcy ¶ 544.06 (16th ed. 2026) ("Under section 544(b), the trustee may exercise the rights of creditors under state fraudulent transfer law or preferential transfer laws."); *id.* at ¶ 548.01 ("Section 544(b) operates by giving the trustee or other estate representative the power to avoid any transfer or obligation that could be avoided by an actual unsecured creditor of the debtor. This derivative standing requires the estate representative to identify both a creditor and a nonbankruptcy ground for avoidance. Most often, the source of avoidance will be fraudulent transfer law.").

Section 548 provides a federal-law path, too. It explicitly "incorporates the law of fraudulent transfers into the Bankruptcy Code," and covers fraudulent transfers "made with actual intent" and transfers "made for less than reasonably equivalent value at a time when the debtor was insolvent or nearly so." *See* 5 Collier on Bankruptcy ¶ 548.01 (16th ed. 2026).

Both Code sections have a similar zone of interests. They both provide means for the trustee to recover property on behalf of the estate and increase the value distributable to creditors. The statutes focus on the actions the trustee may take to avoid fraudulent transfers and bring assets into the estate. *See* 11 U.S.C. § 544(b)(1) ("[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim[.]"); 11 U.S.C. § 548 ("[T]he trustee may avoid any transfer . . . .").

The text focuses on estate value-maximization and the actions that the trustee may take. It doesn't mention the defendants of avoidance actions. So, the relevant zone of interests includes the trustee and parties with an interest in the proceeds of any avoidance actions, but not potential defendants.

The provisions about preferences and fraudulent transfers are about increasing the size of the pie, for the benefit of the estate. They're not about protecting a piece of the pie held by anyone else.

Of course, defendants in avoidance actions can appeal orders issued in the actions against them. But only the trustee and potential recipients of avoidance-action proceeds (*i.e.*, in-the-money creditors) have a sufficient stake to be able to appeal bankruptcy-court orders governing the general management of fraudulent-transfer actions.

Here, the derivative-standing order simply altered the estate's management of the avoidance actions by deciding who would bring them. Only the trustee, a proponent of the motion for derivative standing, and creditors have a say in that decision.

Wilson and Dass aren't the trustee, and they aren't potential in-the-money claimants of proceeds of the actions. They are simply defendants of the actions.

29

As defendants, Wilson and Dass don't have standing to appeal decisions about how the estate manages its side of fraudulent-transfer cases. Their interests don't map onto the zone of interests in section 544(b) or section 548.

At bottom, Wilson and Dass don't have bankruptcy standing to appeal. They are not persons aggrieved. And their interests don't fall within the zone of interests tailored to the provisions about avoidance actions, either. Without standing, they cannot bring an appeal.

## Conclusion

For the foregoing reasons, Wilson and Dass's appeal is dismissed for lack of standing. All pending motions are denied as moot.


Date:   July 23, 2026

Steven C. Seeger
United States District Judge

30